**1:21-cv-203**
Janet T. Neff- U.S. District Judge

## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MICHIGAN

## SOUTHERN DIVISION

**FILED - KZ**
March 1, 2021 2:48 PM

U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
___mq___ Scanned by ___ 3/1/21

NEVIN P. COOPER-KEEL, JD
    Plaintiff Pro Se                             Case No.

V.                                      Hon.

ALLEGAN COUNTY,
ROBERTS KENGIS, MARGARET BAKER,       Magistrate Judge.
JENNIFER KAMPS, and AIMEE KAMPHUIS,
    Sued in their official capacities, and
ROBERTS KENGIS, MARGARET BAKER,
JENNIFER KAMPS, and AIMEE KAMPHUIS,
    Sued in their individual capacities,
    Defendants.

### <u>VERIFIED COMPLAINT WITH JURY TRIAL DEMAND</u>

Plaintiff Nevin P. Cooper-Keel, JD      Defendant Allegan County
3127 127th Avenue                    113 Chestnut Street
Allegan, MI 49010                     Allegan, MI 49010
616.329.7077                            269.673.0300
Nevincooperkeel@gmail.com         bgenetski@allegancounty.org

Defendant Roberts Kengis           Defendant Margaret Baker
113 Chestnut Street                  113 Chestnut Street
Allegan, MI 49010                     Allegan, MI 49010
269.673.0300                            269.673.0300
rkengis@allegancounty.org

Defendant Jennifer Kamps           Defendant Aimee Kamphuis
113 Chestnut Street                  113 Chestnut Street
Allegan, MI 49010                     Allegan, MI 49010
269.673.0300                            269.673.0300

Plaintiff Nevin P. Cooper-Keel, JD, states in support of his complaint:

### Jurisdiction

1. This Complaint involves numerous federal questions and rights violations.

2. Therefore, Jurisdiction is proper under 28 U.S. Code § 1331 and 28 U.S. Code § 1343.

3. The venue properly lies in this District purusuant to 28 USC Section 1391, because the events giving rise to this cause of action occurred in Allegan County, Michigan, which is located in the Western District of Michigan, Southern Division.

**Parties**

4. The Plaintiff, Nevin P. Cooper-Keel, JD, (hereafter "Mr. Cooper-Keel") resides at 3127 127th Avenue, Allegan, Michigan, 49010.

5. Defendant Allegan County is a County in Michigan, where the 48th Judicial Circuit is located.  The clerk of Allegan County is Bob Genetski, 113 Chestnut Street, Allegan, Michigan, 49010.

6. Defendant Roberts Kengis (hereafter "Defendant Kengis") is the 48th Judicial Circuit Court Judge mentioned herein.  Defendant Kengis is sued in his official and individual capacities.  Defendant Kengis is not entitled to the privilege of judicial immunity for the intentional and reckless rights violations stated herein. His address is 113 Chestnut St., Allegan, Michigan, 49010.

7. Defendant Margaret Baker (hereafter "Defendant Baker") is the Chief 48th Judicial Circuit Court Judge mentioned herein.  Defendant Baker is sued in her official and individual capacities.  Defendant Baker is not entitled to the privilege of judicial immunity for the intentional and reckless rights violations stated herein.  Her address is 113 Chestnut St., Allegan, Michigan, 49010.

8. Defendant Jennifer Kamps (hereafter "Defendant Kamps") is the 48th Circuit Court "Friend of the Court" mentioned herein.  Defendant Kamps is sued in her

official and individual capacities. Defendant Kamps is not entitled to the privilege of judicial or governmental immunity for the reckless rights violations stated herein. Her address is 113 Chestnut St., Allegan, Michigan, 49010.

9. Defendant Aimee Kamphuis (hereafter "Defendant Kamphuis") is an Allegan County Friend of the Court interviewer and order recommender mentioned herein. Defendant Kamphuis is sued in her official and individual capacities. Defendant Kamphuis is not entitled to the privilege of judicial or governmental immunity for the intentional and reckless rights violations stated herein. Her address is 113 Chestnut St., Allegan, Michigan, 49010.

**Statement of Facts**

10. In 2016, Mr. Cooper-Keel made some negative remarks in the local media regarding Defendant Kengis, then a candidate for Allegan County Prosecutor and acting Prosecutor, in his job performance as current prosecutor, during a political campaign where Complainant was a candidate for Monterey Township Supervisor, which were published in the local paper.

11. Upon information and belief, Defendant Kengis has held a grudge against Mr. Cooper-Keel since then.

12. Since then, upon information and belief, Defendant Kengis has intentionally abused Mr. Cooper-Keel's rights under the US Constitution in multiple ways.

13. Mr. Cooper-Keel filed for divorce from his wife, Barbara Cooper-Keel (hereafter "Mrs. Cooper-Keel"), in Allegan County's 48th Circuit Court on June 22nd, 2020.

14. That Complaint for Divorce asked for 50/50 custody, and made no other specific requests.

15. After investing every day of Mr. Cooper-Keel's life for nearly the last 10 years in raising his children, 50/50 custody was likely at least the minimum right he and his children were entitled to.

16. An order was signed by Defendant Kengis on June 22nd, 2020, referring the case to Allegan's Friend of the Court (Hereafter "FOC") for custody review.

17. That order referring case to FOC was not noticed in any way to Mr. Cooper-Keel, or his attorney in the divorce, Ravi Gurumurthy.

18. By July 1st, Complainant had helped his wife move into a new dwelling.

19. They had already begun 50/50 exchange of their two sons, then aged seven and nine.

20. Whatever the magic words it takes to get a free attorney, Mrs. Cooper-Keel got a free attorney through Legal Aid of West MI.

21. On July 10th, 2020, Mrs. Cooper-Keel's Counter Claim in the divorce was filed by her attorney in the 48th Circuit Court.

22. In the Counter Claim, it makes the absurdly bad faith claim of Mr. Cooper-Keel being an "absentee" father, even though his children had up to that point resided with him every day of their lives.

23. At some point it must have occurred to Mrs. Cooper-Keel and/or her attorney that it would be absurd to make these claims, yet continue 50/50 visitation, as had been the exchange of children since the parties separated June 25.

24. In that Counter Claim, Mrs. Cooper-Keel, who is a cosmetologist and has no formal training in psychology, claimed that she thinks Mr. Cooper-Keel is bi-polar, pointing to Mr. Cooper-Keel telling her he thinks she's a bad name, when he found out she was cheating on him.

25. Mr. Cooper-Keel had never been diagnosed with any mental illness prior to that, and has since undergone a psychological evaluation with that psychologist stating that there is no evidence of any mental illness.

26. Of course, once you make those absurd claims, you've got to fake it until you make it, so starting the week of July 19th, 2020, Mrs. Cooper-Keel stated that should would not allow Mr. Cooper-Keel to see their sons, continue their normal visitation they had done over the last month since separating, and she would not even let him speak to them or know their whereabouts.

27. Next in the Allegan playbook for how to get the overly willing 48th Circuit Court to discriminate against fathers, invite conduct from your opponent in your custody case, to set them up for a PPO.

28. Then the judge that upholds the PPO might become so in love with his own decision on a PPO, using a preponderance of evidence standard, that he might confuse that decision with the clear and convincing evidence standard needed to alter the custodial environment of the children.

29. July 19th, 2020, had been the last day Mr. Cooper-Keel saw his two children in common with Mrs. Cooper-Keel, until a few days later when his normal parenting time would have began as had been established by the parties conduct since separating June 25th.

30. By Wednesday, July 22nd, what would have been the normal day for Mr. Cooper-Keel to pickup his children, Mrs. Cooper-Keel had not let him speak to the children or know their whereabouts.

31. Under Michigan Child Kidnapping Law, MCL 750.350a, he had a statutory right to go looking for them when Mrs. Cooper-Keel acted with intent to conceal their whereabouts.

32. That's because between the time of filing for divorce and/or separation, and a custody order, both parents are "legally charged" with the care of the minor children.

33. The same natural law of parental rights that produced MCL 750.350a is also at the heart of the federal recognition in parental rights to do the same to defend their children.

34. The Second Amendment of the US Constitution is also an implicit source for the right to self-defense, and the right to defense of another, and especially, the parental right to defend their children when they've been kidnapped without any due process or legal justification.

35. Mr. Cooper-Keel did not intrude into any forbidden grounds to justify issuance or continuance of a PPO when, on July 22nd, he called police and asked them to ascertain the whereabouts and wellbeing of his children, from Mrs. Cooper-Keel, or anything that happened after that.

36. Mrs. Cooper-Keel has never stated any permissible statutory or common law grounds for withholding their children's whereabouts from Mr. Cooper-Keel.

37. The PPO was filed for with an ex parte motion by Mrs. Cooper-Keel, which the 48th Circuit Court granted the same day in ex parte fashion, July 24th.

38. At the time the ex parte PPO was granted, the 48th Circuit Court might not have known that Mrs. Cooper-Keel had made numerous death threats toward Mr. Cooper-Keel and their children as recently as two months before then.

39. Mr. Cooper-Keel filed an objection to the PPO on or about July 30th, 2020, pursuant to MCL 600.2950(14).

40. Mr. Cooper-Keel submitted 4 different complete records of text messages from Mrs. Cooper-Keel threatening either to murder or maim Mr. Cooper-Keel and his children and burn their house down in the six months prior to the July 24th PPO, in his motion to reconsider his objection to the PPO.

41. MCL 600.2950(14) requires the court to hold a hearing within 14 days of the time a defendant in a PPO action files an objection to it.

42. That hearing was not held until August 18th, 2020 – more than the 14 day limit to hold one.

*The Bail Bonds Curveball*

43. Mr. Cooper-Keel owns and operates a bail bonds agency in Allegan, MI.

44. On or about August 13th, before the hearing for Mr. Cooper-Keel's PPO objection, Defendant Kengis summoned Mr. Cooper-Keel on his own motion to show cause why he should not be held in contempt for failure to pay $25,000.00 in bond forfeitures for two fugitives from bond who had already been returned to jail within the statutory time required under MCL 765.28 requiring the court to set aside the bond forfeiture order.

45. Those bail bonds cases have been accepted in the MI Supreme Court under case number 162565, appealing his right to appeal, which the MI Court of Appeals denied but left open application to appeal.

46. No appellate decision on the merits of those bail bonds appeals has been made yet.

47. The circumstances creating the key issue of those bond forfeitures are such that they have arisen for Mr. Cooper-Keel in many district and circuit courts across Michigan, including the 48th Circuit Court, and not once has any court attempted to order Mr. Cooper-Keel pay a bond forfeiture when the fugitive was returned within the statutory time period of MCL 765.28.

48. Mr. Cooper-Keel used the same brief for Defendant Kengis's summons that he has used on many other bond forfeiture issues and every time those courts have set aside those bond forfeiture orders.

49. Upon information and belief, Mr. Cooper-Keel believes Defendant Kengis summoned him on those bond forfeiture orders when he did as retaliation to penalize and discourage Mr. Cooper-Keel from exercising his right to appeal the PPO and for complaining that his right to timeliness of hearing on that was violated.

50. In Mr. Cooper-Keel's summons for the bond forfeiture, the hearing was held and ruled upon within a week of Defendant Kengis awarding full legal and physical custody of him minor children to Mrs. Cooper-Keel and his decision on Mr. Cooper-Keel's motion to reconsider his objection to the PPO.

51. Upon information and belief, Defendant Kengis ruled that Mr. Cooper-Keel should have to pay the $25,000 in bonds, an order for which there is no basis in law or fact for, at the time he did, to adversely impact Mr. Cooper-Keel's right to appeal the other maliciously intentioned, erroneous decisions Defendant Kengis made on custody and the PPO within a week of the $25k decision.

*Back to the rest of it*

52. Though it required a wasted day of the only day of custody trial thus far to counter the bad faith argument of Mr. Cooper-Keel being an "absentee father", during the September 29, 2020, custody hearing in 48th Circuit Court, the court found a joint custodial environment between the children and the parties.

53. After that finding, Defendant Kengis found equal rating in all of Michigan's 12 best interest factors required to making a custody order, other than in Mental Health, which he found favored Mrs. Cooper-Keel.

54. Mr. Cooper-Keel subpoenaed Mrs. Cooper-Keel's health records from Allegan County Mental Health Department (hereafter "ACMHD"), who Mrs. Cooper-Keel admitted in the custody hearing had years earlier diagnosed her with mental health diagnoses which Mr. Cooper-Keel witnessed personnel from there attest to when he went there to support his wife.

55. However, Mrs. Cooper-Keel lied about the extent of the diagnosis and prescriptions.

56. ACMHD declined to supply the subpoenaed records due to HIPPA.

57. ACMHD had also diagnosed Mrs. Cooper-Keel with anti-psychotic medication.

58. *It is not a fair hearing* for a court to rely upon a lay person party's mental health diagnosis of the other party to any degree to the extent of even raising the issue for custody, and yet that accusing party's mental health records that were diagnosed by actual mental health professionals are sealed.

59. But it was just the pretext Defendant Kengis was looking for to exact his biased revenge against Mr. Cooper-Keel.

60. Defendant Kengis was required by the Judicial Cannon to recuse himself from this case due to the perception of bias.

61. It is Mr. Cooper-Keel that has a right to not have to reasonably wonder if he's got a biased judge.

62. There was no legal analysis in Allegan County Friend of Court's custody recommendation.

63. It was written by Defendant Kamphuis, which was signed by Defendant Kengis September 3rd, 2020.

64. Michigan law requires prior to any custody order for minor children, that a finding of custodial environment be entered.

65. Michigan law also requires prior to any custody order, that a determination considering Michigan's 12 best interest factors be made.

66. MCL 722.26a requires courts deciding a custody dispute to ensure both parents are advised of joint custody.

67. At no point in entering the FOC recommended order or the later order was there any effort made by Defendant Kengis to ensure Mrs. Cooper-Keel was advised of joint custody.

68. MCL 722.26a also requires courts to consider joint custody in making a custodial order.

69. There was never any finding put on the record about joint custody by Defendant Kengis.

70. Natural parental rights are the wellspring of federal caselaw delineating parental rights.

71. Through Michigan's statutory process, federal due process requirements are achieved.

72. By not following Michigan's required due process, the Defendants have violated Mr. Cooper-Keel and his children's due process rights under the US Constitution.

73. The proposed order from Allegan's FOC that was signed September 3rd, did not even mention the phrases "custodial environment" or "best interest factor", let alone do any required analysis of them.

74. It consisted of 'he said this, she said that,' throughout the entirety of the it, interspersed with statements of fact from the writer of the proposed order, Defendant Kamphuis.

75. On or about August 24th, 2020, Defendant Kamphuis interviewed Mr. Cooper-Keel's children, pursuant to the June 22nd, 2020, order from Defendant Kengis, that neither Mr. Cooper-Keel or his attorney had been served notice of, referring the case to FOC for evaluation.

76. Mr. Cooper-Keel found out through the grapevine, not through notice from the court, that the FOC would be interviewing his children, about an hour before it was taking place.

77. Mr. Cooper-Keel then went to the FOC office to ask what they were calling his then 7 and 9 year old sons for, why he wasn't notified about it, and to suggest calling the meeting off for lack of notice.

78. Mr. Cooper-Keel was then notified by both a FOC employee and Defendant Kengis's law clerk that they had a "policy" not to let a parent know about the interview of their children if there was any PPO against them.

79. That doesn't explain no notice being sent to Mr. Cooper-Keel or his attorney when the original order referring the case to FOC was entered back on June 22nd, over a month before any PPO was issued.

80. No local 'policy' can override a party's sacred parental right to notice anytime the government wishes to take action against their children, in this case, by ordering them in for an interview.

81. The recommended order, in addition to consisting of almost entirely of hearsay allegedly from the parties, also contained some 'statements of fact' from the report writer, Defendant Kamphuis, apparently as her own testimony.

82. While it didn't include any legal analysis, it did conclude with the statement:

"It should be noted that the father was waiting for the mother and the minor children in the courthouse parking lot on the date of the minor children's interviews. When the mother and the minor children arrived, the father admitted that he told the minor children to get into his vehicle. When they would not, he then came to the Friend of the Court office, raising his voice and causing a scene in front of the minor children. He stated that he did not consent to the minor children being interviewed and wanted to know why he was not told about the interview. During the father's CC appointment the following day, it was explained to him that interviewing the minor children is part of the court order. He was told that had the minor children been in his care, the interviews would have been scheduled with him, but in this case, they were with the mother. In addition, he was reminded that there is a PPO between the parties and his Conciliator did not want the parties to have contact."

83. Upon information and belief and video evidence, Ms. Kamphuis did not witness any of the events described in paragraph 71.

84. It is lying (perjury) to speak in a matter of fact manner of an event you did not personally witness, as though you witnessed it, and don't know as a matter of fact to be true.

85. On the children's first day of school, August 31st, there was still no custody order and Mr. Cooper-Keel had not seen or spoken to his children since July 19th, 2020.

86. Mr. Cooper-Keel picked up his children from school early their first day of school, only so they could have some time with him after such a long period of being parentally kidnapped.

87. Before he or his attorney had received any notice of it, the proposed order that had been submitted by FOC was signed and Mrs. Cooper-Keel was at his home with an Allegan County Sheriff's deputy, on or about September 5th, 2020.

88. The AC Sheriff's Deputy forced Mr. Cooper-Keel's children out of his home under color of law.

89. Mr. Cooper-Keel objected to the order proposed order within the 14 days it gave to object.

90. 'Because I don't like him' is not even remotely sufficient grounds for any governmental actor to wade into such a sacred right as parental rights, which is what the bad government actors behind it did.

91. Such orders are meant to be restrained by Michigan's requirement that they make a proper legal analysis, so that they don't come to a conclusion because of the mere pretext that the negligently trained FOC employee and the biased judge 'don't like' a litigant.

92. When a child has lived with any one of their parents every day of their lives, barring any emergency circumstances, nobody has any right to come in and change that without due process of law – it's simply not their business, whatever whims they've convinced themselves of.

93. There are evidentiary standards that must be met to intrude upon any parental rights – and the psychological analysis of an adversarial spouse in the middle of a

divorce with no training in psychology, doesn't even enter that ballpark of appropriate grounds to use the force of law to wade into parental rights.

94. To do so, is tearing at the fabric of reality and the nuclear family, and the US Constitution.

95. When Mr. Cooper-Keel was an intern during law school, circa 2014, at a law firm in Allegan, MI, Mr. Cooper-Keel worked on a 50 year felony case in which multiple Brady violations were ruled against the Allegan County Prosecutor's Office.

96. The only reason the defense found out about that evidence was by sending a private investigator to talk to people in the neighborhood of the incident.

97. Upon information and belief, Defendant Kengis was at that time the Chief Assistant Allegan County Prosecutor, in a supervisory capacity to the case.

98. More recently, in 2020, it was uncovered through FOIA requests by Mike Villar, who was a candidate for Allegan County Prosecutor, that both Defendant Kengis and Defendat Baker were involved in ex parte communications with the AC Prosecutor's office about criminal trials.

99. Upon discovery of it, numerous mistrials were declared by an Allegan County District Court judge.

100. After Defendant Kengis relied upon the FOC recommendation and its preparer's perjured testimony in the hearing after his objection to the order, Mr. Cooper-Keel first FOIA requested videos event Defendant Kamphuis described as her big conclusion.

101. Allegan County denied his FOIA request, citing security concerns to show video of public commons areas, even though the camera sticking out the side of their building is no secret.

102. It has been the modus operandi of Allegan County Government to suppress evidence and/or rig people's trials for a long time .

103. Mr. Cooper-Keel then subpoenaed the video of the event in early November, 2020.

104. Mr. Cooper-Keel already knew the video he was subpoenaing would show he was not waiting for his wife in the parking lot, nor did he raise his voice in front of his children in the FOC office (which if he did, is his business to exercise his US Constitutionally protected right to raise his children as he sees fit), and that Defendant Kamphuis would not appear in the video, since she was not present to witness the event.

105. So, while serving the subpoena for the video, Mr. Cooper-Keel also served a subpoena on Defendant Kamphuis, in the Allegan County Courthouse.

106. Though there was a locked steel door and bulletproof glass window at the FOC office, it was too scary for Defendant Kamphuis to come to the window to accept personal service, so another FOC employee brought a notarized waiver of service to the door to accept service of the subpoena, which Mr. Cooper-Keel did not have to accept, but did.

107. Allegedly, it was so scary that a litigant would follow the court rules and attempt person service of a subpoena, that Mr. Cooper-Keel's attorney was called the next day to tell him a 'threat order' had been issued by Defendant Kengis and that Mr.

Cooper-Keel would have to be followed by a deputy anytime he entered the courthouse.

108. Upon information and belief, in keeping with traditional MO, this 'threat order' was really initiated by Defendant Kengis to suppress exculpatory evidence by intimidating, harassing, and humiliating Mr. Cooper-Keel from exercising his legal rights of conducting normal business within the courthouse.

109. Defendant Baker was appointed by the Michigan Supreme Court as current Chief Judge.

110. By court rule MCR 8.110, a chief judge has "administrative superintending power and control over the judges of the court and all court personnel...".

111. "We look to our chief judges to manage the administrative affairs of their courts, demonstrate and encourage the highest standards of judicial conduct, and ensure that all persons who have business in our courthouses are treated with courtesy and respect,", said Chief Justice Stephen J. Markman, in 2017.

112. Defendant Baker was responsible for the hiring and training of Friend of the Court personnel.

113. Defendant Kamps, was responsible for supervising and training Defendant Kamphuis.

114. Child custody matters deal with the most sacred rights a person has.

115. At least ensuring basic competency for acting on such matters, in compliance with mandatory Michigan and US Constitution due process standards, was a duty of both Defendant Baker and Defendant Kamps.

116. Res Ipsa Loquitur – the FOC recommended order did not make any mention of the phrases "best interest factor" or "custodial environment", or make anything

near an analysis of them, and therefore did not meet the duty of due process under Michigan and US Constitutions.

117.   If there was any doubt that Defendant Kengis was biased and/or prejudiced against Mr. Cooper-Keel, it was revealed in his ex parte order extending Mrs. Cooper-Keel's PPO against Mr. Cooper-Keel.

118.   Mr. Cooper-Keel filed three visitation order complaints between December 9th, 2020, and January 4th, 2021.

119.   They alleged about a month and a half from November to December that Mr. Cooper-Keel did not get his two phone calls per week the visitation order mandates.

120.   They detailed several weekday evening pickups where Mrs. Cooper-Keel was as much as 30 minutes late for dropoff of the children.

121.   They detailed that on the weekend of January 2 and 3, 2021, what was to be Mr. Cooper-Keel's weekend visit with his sons pursuant to the visitation order, Mrs. Cooper-Keel flat out said she would not allow Mr. Cooper-Keel's visitation with his sons that weekend.

122.   Mrs. Cooper-Keel filed an emergency ex parte request for a continuation of the PPO on February 17th, 2021 – seven days before it was set to expire.

123.   The big emergency requiring suspension of Mr. Cooper-Keel's right to a hearing on extension of the PPO was that he'd filed some parenting time complaints, most recently January 4th, 2021.

124.   Allegan County's FOC did not serve Mr. Cooper-Keel or his attorney with timely notice of the show cause summons issued against Mrs. Cooper-Keel for the complaints, which was to be held February 25th, 2021.

125.  It was scheduled to be heard by an attorney/referee – where Mr. Cooper-Keel objected to the hearing upon grounds of insufficient notice leading to a denial of his right to the assistance of counsel, which was granted.

126.  These lack of notices have become so common, it is difficult to believe them to all be by accident.

127.  Although there was no allegation of any violation of the PPO by Mr. Cooper-Keel in her ex parte request to extend it - the only exhibit submitted with the request was Mr. Cooper-Keel's parenting time complaints – Judge Kengis found that those complaints were grounds to extend the PPO.

128.  To show so little regard for Mr. Cooper-Keel's rights before even hearing them, is the smoking gun for the driving force of all the decisions Judge Kengis has made in these matters – bias, prejudice, and failure to adhere to the appearance of impropriety standard set forth in Canon 2 of the Michigan Code of Judicial Conduct.

129.  Judge Kengis based on objective and reasonable perceptions, has a serious risk of actual bias impacting the due process rights of Mr. Cooper-Keel, as enunciated in Caperton v Massey, 556 US 868; 129 S Ct 2252; 173 L Ed 2d 1208 (2009).

130.  In October, 2020, Mr. Cooper-Keel also filed a records request to view the last 50 custody orders entered in the 48th Circuit Court – which they refused to provide.

131.  Mr. Cooper-Keel noted in his request that he was investigating for widespread bias and was entitled to search these public records pursuant to MCR 8.119.

132.  If that records request denial was at all keeping with Allegan MO, it was to suppress evidence that doesn't look good for bad government actors.

133. Allegan FOC's parenting time complaint form comes pre-printed blanks for "custodial" and "non-custodial" parent on it.

134. Upon information and belief, the entirety of Allegan's court system has been administered to make a disparate impact on custodial environments and parents.

135. Upon information and belief, that disparate impact is particularly geared against fathers.

136. Judicial immunity does not supersede the US Constitution.

137. Intentional bad acts – particularly intentional violation's of a personal constitutional rights - are not protected by judicial or sovereign immunity.

138. The question of intentions behind these actions is a question of fact.

139. Mr. Cooper-Keel's sons didn't just reside with him their entire lives – the children and Mr. Cooper-Keel were living their lives deliberately.

140. Mr. Cooper-Keel has a constitutional right to raise his children as he sees fit.

141. His sons were on a strait line path to opportunity to reach their greatest potential.

142. Now that line has been unduly broken by these unduly bad acts of the government.

143. At around 5:15pm, on September 29th, 2020, as Mr. Cooper-Keel cried in the mostly empty parking lot of the Allegan County Courthouse, right after custody of his children had been unduly ripped away from him in a sham witch trial with Defendant Kengis, Defendant Baker drove by closely and slowly, looked right at Mr. Cooper-Keel, and threw her head back and laughed.

## Count 1 – Intentional Denial of Due Process

144. There were many instances of it in this common nucleus of facts.

145. Not serving the June 22nd, 2020, order referring the case to FOC.

146. Several court employees telling Mr. Cooper-Keel when he came to FOC to find out what they were doing with his kids, saying "its our policy".

147. No such policy can overrule Constitutional rights.

148. The FOC recommendation not even paying lip service to the "12 best interest factors" and "custodial environment" they are required to analysis before entering an order regarding custody and visitation.

149. The ex parte orders entered against Mr. Cooper-Keel – particularly the most recent extension of PPO, that relied on protected speech of Mr. Cooper-Keel's in making a parenting time violation complaint that Defendant Kengis had not yet even held a hearing on – as though Mrs. Cooper-Keel's February 17 ex parte motion, a month and a half after the last parenting complaint Mr. Cooper-Keel had filed, January 4, was some emergency constituting a suspension of Mr. Cooper-Keel's due process right to a hearing and notice before further suspension of his rights.

## Count 2 - Negligence

150. Defendant Baker was responsible for administration of the courthouse – which is not a judicial function, but an administrative one.

151. It might be a bad idea to put a judge in charge of that – since it breaks down barriers of separation between judicial functions, and non-judicial functions, leading to conflicts of interest where these judges are more concerned with backing their buddies they put into these positions than exercising proper judicial restraint on the wielding of law from unelected and poorly trained bureaucrats, like Defendant Kamphuis, in these roles.

152. Regardless, if a judge takes on extra judicial responsibilities, like court management, they are liable for those responsibilities.

153. Defendant Kamps, an attorney, was also directly responsible for supervising the work of Defendant Kamphuis.

154. Both Defendant Baker and Defendant Kamps had a duty to ensure proposed orders coming out of their FOC met minimal Michigan due process standards, and thereby meeting US Constitution due process standards (custodial environment,12 best interest factor analysis, and notice), which at least in Mr. Cooper-Keel's case, it did not.

155. The breach of this duty lead to an unconstitutional taking of Mr. Cooper-Keel's and his sons's right to continue their familial relationship as they would have been entitled to, had these minimal legal duties been carried out.

156. The damages to Mr. Cooper-Keel and his sons from the initiation of an order that did not even have a lawful basis has been massive.

157. The children's grades have been slipping.

158. They've shown attitude problems that they never had.

159. They've been spending 30 hours per week in daycare – which was never their lifestyle before, even when the Cooper-Keels were doing joint custody until the self fulfilling motion for full custody from Mrs. Cooper-Keel.

160. The Allegan County Sheriff's coming to Mr. Cooper-Keel's home on or about September 5th, 2020, was an extensive extension of the damage caused by this negligence.

**Count 3 - Intentional Infliction of Emotional Distress**

161. Defendant Kengis initiated a summons of baseless bail bonds matters totalling $25,000 against Mr. Cooper-Keel.

162. That was done for the purpose and with malice aforethought to cause Mr. Cooper-Keel extreme emotional distress and to underhandedly, adversely affect Mr. Cooper-Keel's right to appeal the custody and PPO decisions – which also caused extreme emotional distress.

163. Abuses of office with such intent are extreme and outrageous conduct.

164. It did and continues to harm Mr. Cooper-Keel in many ways.

165. Defendant Kengis ordering a 'threat order' against Mr. Cooper-Keel for subpoenaeing the FOC investigator, Defendant Kamphuis, and the video proving she committed perjury, was done with the intention to cause emotional distress in Mr. Cooper-Keel.

166. To do such a thing is extreme and outrageous conduct by a judge that is not part of a normal course of judicial action.

167. Defendant Kamphuis intentionally lied about the day Mr. Cooper-Keel came into the FOC office to inquire as to what they're doing with his children with the intention for it to cause severe emotional distress to Mr. Cooper-Keel.

168. To commit perjury for the purpose of taking any parent's parental rights away is an extreme and outrageous act.

169. Defendant Baker intended to give Mr. Cooper-Keel severe emotional distress when she made sure to drive right by him and laugh at him after Defendant Kengis took his kids away under color of law in the sham witch trial – in case Mr. Cooper-Keel had any doubts it was going to be a foregone conclusion what would happen that day.

## Count 4 – Violation of Mr. Cooper-Keel's First Amendment

170. When Defendant Kengis gave his rationale for ruling against Mr. Cooper-Keel for custody of their children on mental health grounds, he stated that 'even though Mr. Cooper-Keel telling his wife he thinks she's a bad name [when he found out she was cheating on him] is protected speech, it is indecent'.

171. By virtue of that being protected speech, it means its not applicable to custody, particularly as evidence for mental health grounds that not a single mental health professional has examined.

172. Drumming up a sham bail bonds forfeiture to overburden Mr. Cooper-Keel from appealing Defendant Kengis's PPO and Custody rulings was taking abusive action against Mr. Cooper-Keel's right to petition the government for a redress of his grievances.

173. In the parenting time violation complaints Mr. Cooper-Keel filed, he had every right to point out his disapproval of the orders that lead to those circumstances.

174. Defendant Kengis violated Mr. Cooper-Keel's right to freedom of speech and to petition the government when he used the protected speech of Mr. Cooper-Keel's, which criticized existing orders, when Mr. Cooper-Keel petitioned the government about parenting time violations as a basis for a continuation of the PPO, let alone in ex parte fashion.

## Count 5 – Violation of Mr. Cooper-Keel's right to a fair hearing

175. Mr. Cooper-Keel did not get a fair hearing with the FOC, due to negligent hiring and training.

176. Not giving Mr. Cooper-Keel or his attorney any notice of the June 22nd, 2020, order referring the case to FOC violated his right to a fair hearing with Defendant Kamphuis.

177. Mr. Cooper-Keel did not get a fair hearing on objection to the FOC recommended order, due to Mrs. Cooper-Keel's baseless mental health claims against Mr. Cooper-keel being considered and favored, but Mrs. Cooper-Keel's mental health records were allowed to be sealed.

178. The solution for that would have been to compel Mrs. Cooper-Keel to make full disclosure of her mental health records, or take her lay person attempts at diagnosis of Mr. Cooper-Keel out of consideration.

179. Not giving timely notice to Mr. Cooper-Keel or his attorney of Mrs. Cooper-Keel's response to his parenting time complaints or notice of hearing for the February 25th, 2021, show cause summons.

180. Mr. Cooper-Keel still had to appear or his claims would be dropped, only to have to object to notice and reschedule the hearing.

181. With the prejudice Judge Kengis showed against Mr. Cooper-Keel's parenting time complaints before even holding a hearing on them, to use them as a basis to continue the PPO, further cheated Mr. Cooper-Keel out of a fair hearing on those complaints – a hearing that has yet to even happen, almost three months since he filed it.

## Count 6 – Cruel and unusual punishment

182. To use such underhanded tactics – like repeated denial of notice, perjury, etc. – to go after a man's children just because you don't like him for political reasons

and/or for exercising his rights is cruel and unusual punishment to him and his children.

183. Mrs. Cooper-Keel's rationale for the continuation of the PPO – 'he doesn't like the custody order or PPO in place, so lets continue the PPO to teach him a lesson' – which was taken hook line and sinker to enter an ex parte order extending PPO for another year is also cruel and unusual punishment for just saying these orders are bad for the children and unconstitutional.

184. The Allegan County Sheriff's deputies following Mr. Cooper-Keel around the courthouse every time he came there for several months for simply serving a subpoena on Defendant Kamphuis and for the exculpatory video evidence the county wanted to hide is also cruel and unusual punishment.

**Count 7 - 42 U.S. Code § 1983.Civil action for deprivation of rights**

185. For all the reasons stated above.

**Damages**

186. Mr. Cooper-Keel invested every day for approximately the last ten years into his sons.

187. This wasn't just some business investment that was tortiously interfered with – these are Mr. Cooper-Keel's only sons and there is nothing and nobody more dear to him.

188. For the same reasons Allegan County might have slid by on brady violations as passable governance on unsuspecting lay persons for years, the damage is all the greater when done to a Juris Doctor, like Mr. Cooper-Keel.

189. There are a million other things Mr. Cooper-Keel would rather be dealing with than these massively undue disruptions to his and his children's lives.

190. Mr. Cooper-Keel normally bills $100 an hour for his time, at this time.

191. Had Mr. Cooper-Keel gotten to focus on his small business enterprises that currently pay him $100 an hour now, instead of the massive amounts of time and energy wasted on appealing the intentional sham bail bonds forfeiture, and the rest of these orders which he is preparing appeals for, he could be making $300 an hour by now.

192. For the undue pain and suffering for Mr. Cooper-Keel and his children due to the violations herein, Mr. Cooper-Keel would have agreed to any monetary price to avoid.

193. Its not cheap and it shouldn't be cheap to do what they just did to Mr. Cooper-Keel and his kids.

WHEREFORE, please award One Million Dollars to Mr. Cooper-Keel in whatever notion of damages to whichever named Defendants herein that this court chooses, including punitive damages, and whatever else This Court deems fair and just.

Respectfully Submitted,

_[signature]_                                            3/1/2021

Nevin P. Cooper-Keel, JD